# COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, SS.**

**SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO: 14-310**

**HEALTH EDGE SOFTWARE, INC.,**

**Plaintiff,**

**v.**

**POMCO, INC.,**

**Defendants**

# REMOVAL TO U. S.  DISTRICT COURT

*Commonwealth of Massachusetts*
# SUPERIOR COURT DEPARTMENT
## THE TRIAL COURT
### WOBURN

MICV *2014-310*

I, C. Andrew Johnson, Deputy Assistant Clerk of the Superior Court, Within and for said County of Middlesex, do certify that the annexed papers are true copies made by photographic process of pleadings in *2014-310* entered in the Superior Court on the *23rd* day of *JANUARY* in the year of our Lord *2014*.

In testimony whereof, I hereunto set my hand and affix seal of said Middlesex Superior Court at Woburn in said County, this *14th* day of *MAY*, in the year of our Lord two thousand Fourteen.



C. Andrew Johnson
Deputy Assistant Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

HEALTH EDGE SOFTWARE, INC.,

Plaintiff,

V.

POMCO, INC.,

Defendant.

I hereby certify on 5/7/14 that the foregoing document is true and correct copy of the
☐ electronic docket in the captioned case
☑ electronically filed original filed on 5/7/14
☐ original filed in my office on ___

Robert M. Farrell
Clerk, U.S. District Court
District of Massachusetts

By: ___
Deputy Clerk

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1441 and 1446, the Defendant, POMCO, Inc., (hereinafter "POMCO"), files this Notice of Removal. This notice removes the civil action *HealthEdge Software, Inc. v. POMCO, Inc.*, MICV2014-00310-D, (hereinafter the "Civil Action"), filed in the Massachusetts Middlesex County Superior Court.

As grounds for this removal, the Defendant state as follows:

### INTRODUCTION AND TIMELINESS

1. Removal of this case is proper pursuant to 28 U.S.C. § 1441(a), which entitles a defendant to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."

2. The Civil Action was filed on or about January 24, 2014, and the Summons and Complaint (attached as **Exhibit A**) were served on POMCO on April 9, 2014. The Complaint seeks damages for alleged breach of contract (2 counts), conversion, and unjust enrichment, arising from the alleged unauthorized use of its software by the Defendant. (See **Exhibit A**, Complaint at Statement of Claim, p. 1). Pursuant to 28 U.S.C. §1446(b), a notice of removal may be filed

within thirty days after receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." Accordingly, POMCO timely files this notice of removal within thirty days of receiving the Summons and Complaint on April 9, 2014.

## SPECIFIC GROUNDS FOR REMOVAL

3. This Court has original jurisdiction over this Civil Action pursuant to 28 U.S.C. § 1332, because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

4. Diversity of Citizenship. Upon information and belief, Plaintiff is a citizen of Delaware, being a corporation organized under the laws of Delaware and has a principal place of business in Massachusetts. (*See* **Exhibit A**, Complaint at ¶ 2, p. 1). Defendant, POMCO, is a citizen of New York, being a corporation organized under the laws of the State of New York, and having its principal place of business in Syracuse, New York. (*See* NYS Dept. of State, Division of Corporations Entity Information, attached as **Exhibit D**; **Exhibit A**, Complaint at ¶ 3, p. 2). 28 U.S.C. § 1332(c) specifically states that a corporation is a citizen of the state in which it has a principal place of business, in addition to all states in which it is incorporated. Therefore, complete diversity exists between Plaintiff, a citizen of Delaware and Massachusetts, and POMCO, a citizen of New York.

5. Amount in Controversy. The amount in controversy with respect to Plaintiff's claim, exclusive of interest and costs, exceeds the threshold of $75,000 required by 28 U.S.C. § 1332(a). Plaintiff claims at least $1,000,000 in damages, with more to be determined. (*See* **Exhibit A**, Civil Action Cover Sheet).

## VENUE IS PROPER IN THIS DISTRICT FOR REMOVAL PURPOSES ONLY

6.     Venue (for removal purposes) is proper and mandated in this District, pursuant to 28 U.S.C. § 1441(a) and § 1446(a), because this Court is part of the "district and division" embracing Middlesex County, Massachusetts, the place where this Civil action was filed.

## NOTICE AND RESERVATION OF RIGHTS

7.   Pursuant to Local Rule 81.1, Defendant will file, within 28 days, certified or attested copies of all records, proceedings, and docket entries in the Civil Action. Copies of all process, pleadings, and orders received by Defendant in the Civil Action are attached hereto as **Exhibit A.**

8.   Defendant has attached hereto as **Exhibit B** a copy of the Notice of Filing of Notice of Removal, which, pursuant to 28 U.S.C. § 1446(d), will be promptly served upon Plaintiff's counsel and filed with the Clerk of the Superior Court Department of the Trial Court, Middlesex County, Commonwealth of Massachusetts, where this action has been pending.  Defendant will also serve a Notice of Removal to All Adverse Parties, which is attached hereto as **Exhibit C**.

9.   By filing this Notice of Removal, the Defendant is not making a general appearance in this venue, is not waiving its right to Jury Trial, nor its right to raise any defenses, nor its right to move to stay proceedings or transfer venue, and is not waiving its right to move for dismissal, pursuant to Fed. R. Civ. P. 12, or otherwise, including without limitation, the adequacy of service of process or personal jurisdiction.

WHEREFORE, the Defendant, POMCO, Inc., respectfully requests that the Civil Action in State court be removed to the United States District Court for the District of Massachusetts, on the foregoing grounds.

Dated: ___May 7, 2014___ ___

Respectfully Submitted,
POMCO, INC.
By its Attorneys,

/s/ *Christopher M. Jantzen*_____
Christopher M. Jantzen, Esq. BBO# 545489
Christina A. Madek, Esq. BBO# 666495
Amanda R. Higgins Esq. BBO# 678434
JANTZEN & ASSOCIATES, P.C.
4 Liberty Square -Seventh Floor
Boston, MA 02109
Phone: 617-457-1919
Fax: 617-574-5050
cjantzen@js-law.com
cmadek@js-law.com
ahiggins@js-law.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of
record, by electronic mail and Federal Express, on ___May 7, 2014___ ___.

/s/ *Christopher M. Jantzen*_____
Christopher M. Jantzen

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

HEALTH EDGE SOFTWARE, INC.,

Plaintiff.

V.

POMCO, INC.,

Defendant.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

Civil Action No.
MICV2014-00310-D

## NOTICE OF REMOVAL TO ALL ADVERSE PARTIES

Pursuant to 28 U.S.C. § 1446(d), Defendant POMCO, Inc. ("POMCO") hereby gives notice to adverse parties that POMCO has filed a Notice of Removal, thereby removing the above-captioned action to the United States District Court for the District of Massachusetts.

Copies of the Notice of Removal and corresponding Notice of Electronic Filing are attached hereto as **Exhibit E**.

Dated: _____

Respectfully Submitted,
POMCO, INC.
By its Attorneys,

Christopher M. Jantzen, Esq. BBO# 545489
Christina A. Madek, Esq. BBO# 666495
Amanda R. Higgins Esq. BBO# 678434
JANTZEN & ASSOCIATES, P.C.
4 Liberty Square- Seventh Floor
Boston, MA 02109
Phone: 617-457-1919
Fax: 617-574-5050

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served by electronic mail and Federal Express upon all counsel of record in this action on

_____.

_____

Christopher M. Jantzen, Esq.

6

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

HEALTH EDGE SOFTWARE, INC.,

        Plaintiff.

V.

POMCO, INC.,

        Defendant.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT


Civil Action No.
MICV2014-00310-D

## NOTICE OF FILING OF NOTICE OF REMOVAL

    Pursuant to 28 U.S.C. § 1446(d), Defendant POMCO, Inc. ("POMCO") hereby gives notice to the Superior Court of Middlesex County, Massachusetts, and counsel for Plaintiff, HealthEdge Software, that POMCO has filed a Notice of Removal, thereby removing the above-captioned action to the United States District Court of the District of Massachusetts.

    Copies of the Notice of Removal and corresponding Notice of Electronic Filing are attached hereto as **Exhibit E**.

Dated:

                                     Respectfully Submitted,
                                     POMCO, INC.
                                     By its Attorneys,

                                     Christopher M. Jantzen, Esq. BBO# 545489
                                     Christina A. Madek, Esq. BBO# 666495
                                     Amanda R. Higgins Esq. BBO# 678434
                                     JANTZEN & ASSOCIATES, P.C.
                                     4 Liberty Square
                                     Seventh Floor
                                     Boston, MA 02109
                                     Phone: 617-457-1919
                                     Fax: 617-574-5050

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served by electronic mail and Federal Express upon all counsel of record in this action on

_____.

Christopher M. Jantzen, Esq.

# JANTZEN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

### 4 LIBERTY SQUARE
### SEVENTH FLOOR
### BOSTON, MASSACHUSETTS 02109

---

TELEPHONE (617) 457-1919
FACSIMILE (617) 574-5050

March 8, 2014

**ATTENTION: Ms. Pinckney**
Civil Clerk
Middlesex Superior Court
200 Trade Center
2nd Floor
Woburn, MA 01801

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE ~~~~~~~~~~~~ MIDDLESEX

MAY 02 2014

*RE:*  *Health Edge Software, Inc. v. Pomco, Inc.*
       *Middlesex Superior Court, C.A. No. MICV2014-00310-D*

Dear Ms. Pinckney:

Please pursuant to our telephone conversation this afternoon, enclosed please find the Defendant's *Notice of Removal*, with the electronic filing/docket number from the United States District Court. Should you require anything further, please do not hesitate to contact me.

Thank you again for your kind assistance.

Very truly yours,

Christina A. Madek
Christopher M. Jantzen

CAM/mp
Enclosure

# JANTZEN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

**4 LIBERTY SQUARE
SEVENTH FLOOR
BOSTON, MASSACHUSETTS 02109**

TELEPHONE (617) 457-1919
FACSIMILE (617) 574-5050

May 7, 2014

### *VIA FEDERAL EXPRESS*

Civil Clerk
Middlesex Superior Court
200 Trade Center
2nd Floor
Woburn, MA 01801



### RE: *Health Edge Software, Inc. v. Pomco, Inc.*
*Middlesex Superior Court, C.A. No. MICV2014-00310-D*

Dear Sir/Madam:

Enclosed for filing and docketing in the above referenced matter, please find the following:

1) Defendant, POMCO, Inc.'s, Notice of Filing of Notice of Removal; and
2) Defendant, POMCO, Inc.'s, Notice of Removal to All Adverse Parties.

Thank you for your kind assistance in this matter.

Very truly yours,

Christopher M. Jantzen
Christina A. Madek

CMJ/CAM/pk
Enclosures

cc:   Thomas E. Peisch, Esq. (via email and Federal Express)
      Donald C. Doerr, Esquire (via email)
      Edward E. Kopko, Esquire (via email and first class mail)

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
C.A. No.

**14-0310**

)
HEALTHEDGE SOFTWARE, INC., )
)
*Plaintiff,* )
)
v. )
)
POMCO, INC., )
)
*Defendant.* )
)

FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

JAN 2 3 2014

CLERK

## COMPLAINT

Plaintiff HealthEdge Software, Inc. ("HealthEdge"), by and through its attorneys,

hereby alleges as follows:

### Statement of Claim

1.      By this action, HealthEdge seeks damages against defendant, POMCO,

Inc. (POMCO) for breach of contract, conversion, and unjust enrichment arising from

POMCO's breach of the parties' Software License Agreement (the "SLA") and

Professional Services Agreement (the "PSA"). Briefly, POMCO has failed to pay

HealthEdge nearly $1 million in mandatory fees, costs, and expenses, and wrongfully

continues to use HealthEdge's software after termination of its license. HealthEdge also

seeks temporary and permanent injunctive relief to enjoin POMCO's continued,

unauthorized use of HealthEdge's software.

### Parties

2.      HealthEdge is a Delaware corporation with a principal place of business

located at 30 Corporate Drive, Burlington, MA 01803.

3.     POMCO is a New York corporation with a principal place of business
located at 2425 James Street, Syracuse, New York 13206.

## Jurisdiction

4.     Jurisdiction of the subject matter for this action is conferred upon this
Court by virtue of M.G.L. c. 212, § 3.

5.     POMCO is subject to this Court's specific and general personal
jurisdiction pursuant to due process and the Massachusetts long arm statute, M.G.L. c.
223A § 3, because, among other reasons, POMCO regularly conducts business in
Massachusetts, the contracts at issue were negotiated in Massachusetts, and a substantial
portion of the services provided by HealthEdge to POMCO were provided in
Massachusetts.

## Facts

6.     HealthEdge develops, licenses and markets computer software
applications for administrating health insurance benefits and associated business
processes.

7.     POMCO desired to utilize and implement HealthEdge's proprietary
software marketed and licensed within the HealthRules® application family (as more
particularly described in the SLA, the "Software").

8.     On March 26, 2010, POMCO and HealthEdge entered into the SLA,
which sets forth the parties' agreement concerning the use of the Software. A true and
correct copy of the SLA (as amended) is attached hereto and incorporated herein as
Exhibit 1.

2

9.     POMCO also desired for HealthEdge to provide it with certain services related to the implementation of the Software.

10.     On April 1, 2010, POMCO and HealthEdge entered into the PSA, which sets forth the parties' agreement concerning the services.  A true and correct copy of the PSA (as amended) is attached hereto and incorporated herein as Exhibit 2.

11.     HealthEdge fulfilled all of its obligations under the SLA, including delivery of the Software to POMCO.

12.     HealthEdge fulfilled all of its obligations under the PSA, including, providing the services set forth in the Statements of Work (subject to authorized Project Change Requests) contemplated thereunder in a good and workmanlike manner.

13.     For reasons unknown to HealthEdge, POMCO chose to hire a third-party company, Blue Slate Solutions, LLC ("Blue Slate"), to implement the Software, thus limiting HealthEdge's role and responsibilities in that regard.

14.     Thereafter, POMCO claims to have experienced some difficulties with the Software.

15.     The Software, however, was delivered in its properly-functioning form. Any difficulties in implementation are the result of POMCO's systems environment and/or the implementation by Blue Slate.

16.     Despite the SLA's express provision (Section 7.2) that repair or replacement (at HealthEdge's option) of the Software is POMCO's sole remedy for breach of warranty, POMCO has withheld payment of fees due to HealthEdge.

17.     As a result of POMCO's breaches for nonpayment of the license fee pursuant to the SLA (of which POMCO received notice and an opportunity to cure in

accordance with the SLA), on or about February 7, 2013 HealthEdge terminated the SLA (and POMCO's license to use the Software) pursuant to Section 6.2(a) and Maintenance under the SLA pursuant to Section 4.4.

18.    On or about February 7, 2013, HealthEdge also notified POMCO that, as a result of the termination, it was to cease using the Software and return the same to HealthEdge.

19.    Without authorization and in direct contravention of the terms of the SLA, POMCO failed to return the Software and continues to use it, while failing to pay the substantial amounts due to HealthEdge.

20.    POMCO has knowingly and willfully violated HealthEdge's property interest in the Software.

21.    By continuing to use the Software in violation of the terms of the SLA, POMCO is violating section 9.1(c) of the SLA.

22.    As a result, pursuant to Section 9.3 of the SLA, HealthEdge is entitled to injunctive relief prohibiting POMCO's continued use of the Software in violation of Section 9.1(c).

## Count I
## Breach of Contract – Software License Agreement

23.    HealthEdge incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

24.    The SLA is a valid and enforceable agreement between POMCO and HealthEdge.

25.    HealthEdge has performed its obligations under the SLA.

4

26.     POMCO breached the SLA by, *inter alia*, failing to pay the amounts due

thereunder and continuing to use the Software after termination of its license.

27.     HealthEdge has suffered and will continue to suffer harm as a result of

POMCO's breaches of the SLA.

## Count II
### Breach of Contract – Professional Services Agreement

28.     HealthEdge incorporates by reference the preceding paragraphs of this

Complaint as if fully set forth herein.

29.     The PSA is a valid and enforceable agreement between POMCO and

HealthEdge.

30.     HealthEdge has performed its obligations under the PSA.

31.     POMCO breached the PSA by failing to pay the amounts due thereunder.

32.     HealthEdge has suffered and will continue to suffer harm as a result of

POMCO's breaches of the PSA.

## Count III
### Conversion

33.     HealthEdge incorporates by reference the preceding paragraphs of this

Complaint as if fully set forth herein.

34.     HealthEdge owns and has, at all relevant times, owned the Software.

35.     POMCO, by one or more wrongful acts, converted and used the Software

for its benefit without license or authorization from HealthEdge after the termination of

the SLA.

36.     HealthEdge has suffered damages including lost fees, as a result of

POMCO's conversion of the Software.

5

## Count IV
## Unjust Enrichment

38. HealthEdge incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

39. HealthEdge has provided services to POMCO as set forth in the Statement of Work, and in doing so, conferred a benefit upon POMCO.

40. POMCO has accepted and appreciated the benefit conferred to it by HealthEdge, but has not paid for the services rendered.

41. It is inequitable for POMCO to retain the benefit of the services HealthEdge has provided without paying for the full and complete value thereof.

42. In addition, POMCO continues to use the Software without authorization while failing to pay substantial amounts due to HealthEdge.

43. POMCO's continued use of the Software also confers a benefit upon POMCO.

44. POMCO has accepted and appreciated the benefit conferred to it by HealthEdge, but has not paid for the full and complete value thereof.

45. POMCO has been unjustly enriched at HealthEdge's expense.

## Count V
## Temporary and Permanent Injunctive Relief

46. HealthEdge hereby incorporates the foregoing paragraphs of this Complaint as if fully set forth herein.

47. HealthEdge is entitled to have POMCO and its officers, agents, representatives, independent contractors, and employees barred from continuing to retain, access, utilize, and derive benefit from the Software without compensating HealthEdge.

6

48.     If POMCO and its officers, agents, representatives, independent contractors, and employees are not enjoined from retaining and continuing to use the Software without offering any compensation to HealthEdge, HealthEdge will be left without an adequate remedy at law.

49.     POMCO expressly agreed that POMCO is entitled to such injunctive relief in Section 9.3 of the SLA.

50.  · HealthEdge is therefore entitled to temporary and permanent injunctive relief barring POMCO and its officers, agents, representatives, independent contractors, and employees from continuing to retain and use the Software.

WHEREFORE, HealthEdge prays for judgment in its favor and against POMCO as to all counts of this Complaint, and for the following relief:

>   A.     Actual damages in an amount to be proved at trial;
>
>   B.     Temporary and permanent injunctive relief barring POMCO and their officers, agents, representatives, independent contractors, and employees from further wrongful retention and use of the Software and requiring POMCO to return the Software to HealthEdge;
>
>   C.     An award of attorneys' and experts' fees, costs and disbursements to the fullest extent permitted by law;
>
>   D.     Interest at the maximum rate permissible by law; and
>
>   E.     Such other relief as the Court may deem just and proper.

7

## **JURY DEMAND**

Plaintiff HealthEdge Software, Inc. demands a trial by jury on all issues so triable.

HEALTHEDGE SOFTWARE, INC.
By its attorneys,

Thomas E. Peisch BBO # 393260
Kurt B. Fliegauf, BBO #564329
Michael J. Rossi, BBO # 666082
CONN KAVANAUGH ROSENTHAL
    PEISCH & FORD, LLP
Ten Post Office Square
Boston, MA 02109
(617) 482-8200
*tpeisch@connkavanaugh.com*
*kfliegauf@connkavanaugh.com*
*mrossi@connkavanaugh.com*

Of counsel,

Joseph Murray
Robert H. Miller
Murray Murphy Moul + Basil LLP
1533 Lake Shore Drive
Columbus, OH 43204

Date: January 23, 2014

906215 1

## Software License Agreement

This Software License Agreement ("Agreement") is entered into as of the 26th day of March, 2010 with an Effective Date of the 26th day of March, 2010, by and between HealthEdge Software, Inc. ("HealthEdge"), a Delaware corporation with its principal place of business at 10 Burlington Mall Road, Suite 150, Burlington Massachusetts 01803, and POMCO, Inc., its affiliates and successors with its principal place of business at 2425 James Street, Syracuse, NY 13206 ("Customer"). For purposes of this Agreement, POMCO, Inc. shall be deemed to include any current parent, subsidiary, affiliate of, or entity under common control.

### Recitals

A.    HealthEdge develops, licenses and markets computer software applications for administering health insurance benefits and associated business processes; and

B.    Customer desires to acquire a license to use the Software and the Documentation in its internal business operations and to provide its own services to its Permitted Users (as defined below) (the "Intended Use") and HealthEdge desires to grant Customer such a license.

**THEREFORE,** the parties agree as set forth herein.

### 1.    Definitions

**1.1    "Platform"** means the computer and operating systems, on which Customer is authorized to use the Software pursuant to this Agreement, as set forth in the Documentation

**1.2    "HIPAA"** means the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-191, and any regulations promulgated thereunder, as amended, including but not limited to the Standards for Privacy of Individually Identifiable Health Information found at 45 C.F.R. Parts 160 and 164 ("HIPAA Privacy Standards"), and the Standards for Electronic Transactions found at 45 C.F.R. Parts 160 and 162 ("Transaction Standards").

**1.3**    **"Documentation"** means the user manuals, specifications and other material which describe the functionality and use of the Software.

1.4    **"Licensed Location"** means the address of a U.S. facility designated from time to time by Customer and provided to HealthEdge as the location where the Customer shall install and use the Software.

1.5    **"Members"** means any person recorded in the data repository of the Software whose status in the repository is Active and the member has effective coverage in the Customer's client's benefit plan.

1.6    **"Permitted Users"** means collectively, Members, groups of subscribers (including employers), and authorized brokers/producers.

1.7.    **"PSA"** means the Professional Services Agreement dated this date between Customer and HealthEdge with respect to the implementation of the Software.

**1.8**    **"Software"** means the computer program or programs marketed and licensed within the HealthRules™ application family, which is provided to Customer under this Agreement, as more fully set forth in Schedule A, in object code form only, including all Updates and Upgrades.

**1.9    "Proprietary Rights"** means, with respect to the Licensed Material (as defined in Section 2 below), all current and future worldwide intellectual property rights including, without limitation, all patents, copyrights, trademarks, trade secrets and any and all applications and registrations for any of the foregoing, as well as any other intellectual property rights related or applicable thereto, and any derivative works, translations, customized versions, patches, enhancements, improvements, modifications, error corrections, or other versions thereof prepared by HealthEdge, its licensors, or any other person through the date hereof and at all future times.

**1.10**    **"Protected Health Information"** has the meaning set forth in the Business Associate Agreement between the parties attached hereto as Schedule B.

**1.11** "**Term**" means the term of this Agreement as set forth in Section 6.1 below.

**1.12** "**Updates**" means interim releases of the Software incorporating standard maintenance, improvements, patches, error corrections and enhancements that are provided by HealthEdge to customers who subscribe to HealthEdge's maintenance and support services. Updates are designated by all digit(s) to the right of the decimal point (e.g., 3.x.x).

**1.13** "**Upgrades**" means full product releases of the Software, which contain substantial functional enhancements. Upgrades are also provided by HealthEdge to customers who subscribe to HealthEdge's maintenance and support services. Upgrades are designated by the digit to the left of the decimal point (e.g., x.0).

## 2.  Ownership

2.1     **Ownership.** Customer acknowledges that as between the parties, the Software, Documentation, Updates and Upgrades provided by HealthEdge pursuant to Section 3.2 of this Agreement (collectively, the "Licensed Materials"), and all Proprietary Rights therein: (i) are owned or licensed by and are proprietary to HealthEdge and its licensors and (ii) constitute trade secrets of HealthEdge or its licensors, and (iii) constitute Confidential Information as defined in Section 9.1 below. HealthEdge reserves all rights not expressly granted by it to Customer under this Agreement. Customer shall not be an owner of any copies of, or have any interest in, the Software or Documentation. HealthEdge acknowledges that as between the parties, all data regarding Customer's members and member firms including member demographics and pricing data that will be used in connection with the Software: (i) is owned or licensed by and is proprietary to Customer and (ii) constitutes trade secrets of Customer, and (iii) constitutes Confidential Information of Customer.

**2.2     Source Code Escrow.** HealthEdge shall escrow with an escrow agent of its choosing the following items, collectively, the "Source Code" within sixty (60) days of the release date of that Software: Source code, in human readable form, on electronically readable media in the original programming code language for (1) the Software, and (2) any subsequent enhancements to, or releases of, the Software which HealthEdge makes available to Customer under this Agreement. The Source Code shall remain in escrow for the term of this Agreement. The Source Code Escrow Agreement shall provide that the escrow agent shall release the Source Code Escrow to Customer in the event of (a) HealthEdge's adjudged insolvency, bankruptcy or assignment of substantially all of HealthEdge assets or (b) a materially diminished level of service provided by HealthEdge to the Customer in support of the Software. Customer shall provide written notice of such diminished level of service and HealthEdge shall have 30 days to cure same. These events shall be deemed "Release Conditions" for purposes of this Agreement.

2.3     **Source Code License.** HealthEdge hereby grants Customer a non-exclusive, license, exercisable solely upon the occurrence of a Release Condition, to use, modify, copy, produce derivative works from, display, disclose to persons who have entered into a written agreement containing substantially the same confidentiality provisions as in this Agreement for the purpose of maintaining the Software for Customer, and otherwise to utilize the Software and the Source Code Escrow and other materials necessary solely and exclusively to maintain and improve the Software for use by Customer subject always to the limitations in this Agreement, including but not limited to those prohibiting the re-sale, sub-license and distribution of the Software except only for the rights to modify and create derivative works which shall be permitted under the Source Code license. Notwithstanding anything to the contrary in this Agreement, Customer shall not use the source code to compete with HealthEdge. HealthEdge shall not be responsible for providing Software Support in the event of a Release Condition.

2.4     **Perpetual License**. After the License Fee payments as outlined in Schedule A of this Agreement, HealthEdge agrees to grant Customer a fully paid-up, royalty free license to the Software to use, modify, copy, produce derivative works from, and otherwise to utilize the Software solely and exclusively to maintain and improve the Software for use by Customer subject always to the limitations in this Agreement, including but not limited to those prohibiting the re-sale, sub-license and distribution of the Software. Notwithstanding anything to the contrary in this Agreement, Customer shall not use the Software to compete with HealthEdge.



**3.    Right of Access and Restrictions**

**3.1    Grant.** Under the terms and conditions of this Agreement, until a perpetual license is granted, HealthEdge grants to Customer, and Customer accepts, a non-exclusive, non-transferable license to use and operate, in object code fonnat only, the Software, in accordance with the associated Documentation, solely for the Intended Use during the Term. Permitted Users outside Customer may also access all features of the Software designed for such access. The foregoing license does not convey any rights of ownership in or to the Software, Documentation or any related materials to Customer or any third party. The license is only granted for the duration of the term of this Agreement, including any renewal thereof.

**3.2    Restrictions.** Customer shall install and use the Software and Documentation only on the Platform at a U.S. facility designated from time to time by Customer (the "Licensed Locations"). Any change to Licensed Locations during the term of this Agreement must be approved by HealthEdge in writing whereby such approval shall not be unreasonably withheld. Customer shall utilize the Software only as permitted by this Agreement, only for the Intended Use and only within the usage restrictions which may be more specifically provided in Schedules attached hereto. Customer shall display and retain HealthEdge's and/or its suppliers' copyright, trademark, proprietary, or confidentiality statement and other notices on any portion of the Software and Documentation as delivered by HealthEdge.  Customer shall not (a) modify, reverse engineer, or de-compile the Software, or create derivative works based on the Software or the Documentation, (b) port, translate or localize the Software or Documentation other than development work performed on behalf of Customer by HealthEdge, (c) sell, lease, license, sublicense, copy, reproduce, market, install the Software on its customers' premises, or distribute the Software, or (d) disclose the results of any performance tests or qualitative analysis on the Software to any third party without the prior written consent of HealthEdge. Additionally, Customer will permit representatives of HealthEdge to audit Customer's use of the Software.  Any such audit shall be conducted following no less than 60 days prior written notice, during regular business hours at Customer's location and shall not unreasonably interfere with Customer's business activities.

**4.    Maintenance and Support.**

**4.1. Maintenance Services.** In return for payment of the Maintenance Fees as provided in Schedule A, HealthEdge agrees to provide to Customer during the term of this Agreement support and maintenance (collectively "Maintenance") as follows:

**4.1.1. Support.** HealthEdge will provide Support as provided for in the Service Level Agreement in Schedule C. Support will be provided to Customer for current versions of the Software (as defined in Section 4.3.1).

**4.1.2. Updates and Upgrades.** HealthEdge will supply to Customer, at no additional charge, any Upgrades or Updates to the Software that HealthEdge makes generally available. Any such Upgrades or Updates shall become part of the Software for all purposes of this Agreement.

**4.3. Exclusions.** HealthEdge shall have no obligation to provide Support or any other operational and technical assistance with respect to any failure of the Software if such failure is caused in whole or in part by: (i) Customer, its employees or agents or any person accessing or using the Software not in accordance with the Documentation, (ii) changes to the Platform (as set forth in the Documentation) and/or related software, including the hardware, operating systems software, communications software, interface software, and/or any applicable third-party software used in conjunction with the Software without the written consent of the HealthEdge; (iii) changes to Software which have not been authorized by HealthEdge in writing; (iv) hardware failure (including failure of any required hardware or Platform) or interruption, failure, lack of capacity or degradation or delay in performance of, any portion of any network or communications system; (v) customizations and extensions to the Software that are developed by Customer, including scripted rules, database queries, and external programs; (v) issues related to third-party software, excluding issues arising out



of any application program interface; or (vi) use of the Software other than in accordance with the terms and conditions of this Agreement.

**4.3.1 Support for Prior Versions.** Customer acknowledges and agrees that the Maintenance to be provided by HealthEdge hereunder is limited to:

- the most current Upgrade of the Software,
- the immediately preceding Upgrade or,
- any Upgrade issued during the previous 12 months.

Customer will make reasonable efforts to install new versions of the software within ninety (90) days of receipt of media or notification of availability. HealthEdge reserves the right to provide Updates for only specific versions of the Software it deems appropriate.

**4.4. Termination of Maintenance.** HealthEdge may terminate Maintenance without notice or refund if this Agreement is terminated. Termination of Maintenance hereunder shall not in and of itself terminate this Agreement. Customer may request in writing that Company cease the provision of Maintenance. Ninety (90) days after such request, Company shall cease providing Maintenance and will from that date forward, cease invoicing Customer for Maintenance.

4.5 **Re-establishment of Maintenance after Termination.** Customer may, after having previously terminated Maintenance according to section 4.4, request in writing that Company re-establish Maintenance. Company will provide such Maintenance according to its then current policies and mutually agreeable pricing.

**4.6 Ad Hoc Customer-Requested Support.** Customer may request additional services not covered by Maintenance from time to time. HealthEdge will make all commercially reasonable efforts to provide these services on a Time & Materials basis at HealthEdge's then current hourly rates.

**5.     Fees**

**5.1     Fees.** In consideration for the license granted to Customer under this Agreement, HealthEdge will invoice Customer and Customer shall pay HealthEdge the Fees as set forth on Schedule A within thirty (30) days of the date of invoice. Any amounts shown on Schedule A that are not paid within 45 days shall bear interest at the lesser of 1.5% per month or the highest amount allowed by law, whichever is lower.

**5.2     Taxes.** In addition to other amounts payable under this Agreement, Customer shall pay any and all federal, state, municipal, or other taxes, duties, fees, or withholding currently or subsequently imposed on Customer's use of the Software or the payment of the License Fee to HealthEdge, other than taxes assessed against HealthEdge's net income.

**5.3     Customer Audits.** HealthEdge shall have the right to perform audits of the Customer to confirm that the correct amounts have been paid. Such audits shall be conducted no more frequently than once in any 12 month period unless a discrepancy is found in a prior audit. Such audits shall be at HealthEdge's expense.

**6.     Term and Termination**

**6.1     Term.** This Agreement shall continue in effect from the Effective Date for a period of ten (10) years (the "Initial Term") and shall renew automatically for additional 1 year term(s) at the then current fees and policies unless Customer notifies HealthEdge at least 90 days prior to the expiration of its desire to terminate, unless terminated as set forth in Section 6.2 below.

**6.2     Termination.** Either party, as applicable, shall have the right, in addition and without prejudice to any other rights or remedies, to terminate this Agreement as follows:



(a)  By HealthEdge, ten (10) days after written notice, if Customer fails to pay the amounts due to HealthEdge pursuant to this Agreement;

(b)  By HealthEdge, upon five (5) business days written notice, if Customer has committed a breach of Section 3.2 of this Agreement that is not cured within 5 business days;

(c)  By either party, upon forty-five (45) days written notice, if the other party has committed a material breach of this Agreement, other than those described in Sections 6.2(a) and 6.2(b), that is not cured within such 45 days; or

(d)  By either party, immediately upon written notice, if (i) all or a substantial portion of the assets of the other party are transferred to an assignee for the benefit of creditors, to a receiver, or to a trustee in bankruptcy, (ii) a proceeding is commenced by or against the other party for relief under bankruptcy or similar laws and such proceeding is not dismissed within 60 days, or (iii) the other party is adjudged bankrupt.

**6.3   Rights on Termination.**  HealthEdge and its suppliers have and reserve all rights and remedies that they have by operation of law or otherwise to enjoin the unlawful or unauthorized use of Software or Documentation. On termination or expiration of this Agreement all rights granted to Customer under this Agreement cease and Customer will promptly cease all use of the Software and Documentation unless allowed under Sections 2, 5, 6.3, 7, 8, 9, 10 and 11 which shall survive termination or expiration of this Agreement. Upon Termination, no further Fees will be due and enforceable under this Agreement.

## 7.   Warranties, Disclaimer and Limitations

**7.1   Limited Warranty and Disclaimer.**  HealthEdge and its suppliers warrant that for a period of ninety (90) days from the date of first production use of the Software, (a) the Software media will be free of major defects in materials and workmanship under normal, proper and intended use; and (b) when used for the Intended Purpose on the Platform, the Software will perform substantially in accordance with the Documentation in all material respects. HealthEdge and its suppliers do not warrant or represent that the operation of the Software will be uninterrupted or error-free, the Documentation will be error-free, or that all errors will be repaired. Customer assumes the responsibility for the selection of the Software to achieve Customer's intended results. The warranty is made only to Customer, and HealthEdge's and its suppliers' warranty obligations shall be void if the Software is modified by or through Customer without the express prior written consent of HealthEdge. THE WARRANTIES SET FORTH IN THIS SECTION 7.1 ARE IN LIEU OF, AND THIS AGREEMENT EXPRESSLY EXCLUDES, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, ORAL OR WRITTEN, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ERROR FREE PERFORMANCE.

**7.2   Remedies on Breach of Warranty.**  In the event of any breach of the warranty set forth in Section 7.1, Customer's sole, exclusive remedies shall be for HealthEdge, at HealthEdge's option, to replace or repair the defective Software or media.

**7.3   Limitation of Liability.**  NEITHER PARTY SHALL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES, INCLUDING THE LOSS OF PROFITS, REVENUE, DATA, OR USE OR COST OF PROCUREMENT OF SUBSTITUTE GOODS INCURRED BY ANY PARTY, REGARDLESS OF THE FORM OF ACTION, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT WILL HEALTHEDGE'S AGGREGATE LIABILITY FOR ANY DAMAGES ARISING FROM OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT OR IN TORT OR UNDER ANY OTHER LEGAL THEORY (INCLUDING STRICT LIABILITY AND NEGLIGENCE), EXCEED THE AMOUNTS ACTUALLY PAID BY CUSTOMER TO HEALTHEDGE UNDER THIS AGREEMENT.

**7.4   Limitations Period.**  No action arising out of or in connection with this Agreement or the transactions contemplated by the Agreement may be brought by either party against the other more than one year after the action accrues.



7.5 **Warranty Regarding Regulatory Compliance**. HealthEdge represents and warrants that, as of the Effective Date of this Agreement, the operation of the Software in accordance with this Agreement and applicable Documentation is consistent with all then-effective requirements of all federal laws and regulations which require final implementation by a date on or prior to the effective date. In the event requirements under such federal laws or regulations or state laws or regulations affecting the operation of the Software change after the Effective Date hereof, HealthEdge agrees it will use commercially reasonable efforts to make the next available Update of the Software consistent with such changes and to make same available to Customer before the date of required implementation for such changed legal or regulatory requirements.

## 8. Infringement Indemnity

HealthEdge shall indemnify, defend, and hold Customer harmless from and against any third party claims, actions, or demands alleging that the Software infringes any valid US patent in effect as of the Effective Date of this Agreement or any copyright or trade secret right of a third party. HealthEdge will pay such damages or costs as are finally awarded against Customer for such infringement or misappropriation provided that Customer gives HealthEdge: (a) prompt written notice of any such action and of all prior related claims; (b) sole control of the defense and settlement of such action; and (c) full cooperation in any defense or settlement. HealthEdge shall not be liable for any fees, costs or damages incurred without such prior written notice, control and cooperation. If use of the Software is permanently enjoined for any reason, HealthEdge, at Licensor's option, and in its sole discretion, may (a) modify the Software so as to avoid infringement; (b) procure the right for Customer to continue to use and reproduce the Software and Documentation; or (c) terminate this Agreement and refund the fees paid by Customer for the infringing Software. Licensor shall have no obligation under this Section 8.1 for or with respect to claims, actions, or demands alleging infringement that arise as a result of (a) the combination of the Software with any items not supplied by HealthEdge; (b) modification of the Software or Documentation by Customer or by HealthEdge in compliance with Customer's designs, specifications, or instructions; (c) the direct or contributory infringement of any process patent by Customer through the use of the Software; (d) use of the Software other than in accordance with the terms and conditions of this Agreement; (e) use of a previous version of the Software if HealthEdge provided Customer with a new version of the Software and Customer did not commence use of such version within sixty (60) days of HealthEdge's provision thereof; or (f) continued allegedly infringing activity by Customer after Customer has been notified of the possible infringement. The foregoing provisions of this Section 8.1 state HealthEdge's sole obligation and Customer's exclusive remedy in the event any such claim or action is commenced or is likely to be commenced.

## 9. Confidentiality

9.1 **Confidentiality.** For purposes of this Agreement, "Confidential Information" shall mean all written, electronic or oral information, disclosed by either party to the other, related to the operations of either party or a third party that has been identified as confidential or that by the nature of the information or the circumstances surrounding disclosure ought reasonably to be treated as confidential. Customer acknowledges that the Software and Documentation, and all information relating to the business and operations of HealthEdge that Customer learns or has learned during or prior to the term of this Agreement ("Confidential Information"), is the valuable, confidential, and proprietary information of the HealthEdge (or is licensors and suppliers). HealthEdge acknowledges that the data and information relating to the business and operations of the Customer including all data regarding Customer's members and member firms including member demographics and pricing data that HealthEdge learns or has learned during or prior to the term of this Agreement ("Confidential Information"), is the valuable, confidential, and proprietary information of the Customer. During the period this Agreement is in effect, and at all times afterwards, each party, and its employees, contractors, consultants, and agents, will (a) safeguard the Confidential Information of the other party with the same degree of care that it uses to protect its own confidential information, which in any event shall be no less than a reasonable degree of care; (b) maintain the confidentiality of this information; (c) not use the Confidential Information except as permitted under this Agreement; and (d) not disseminate, disclose, sell, publish, or otherwise make available the Confidential Information to any third party without the prior written consent of the other party.



**9.2 Limitations on Confidentiality Restrictions.** Section 9.1 does not apply to any information that (a) is already lawfully in the receiving party's possession (unless received pursuant to a nondisclosure agreement); (b) is or becomes generally available to the public through no fault of the receiving party; (c) is disclosed to the receiving party by a third party who may transfer or disclose such information without restriction; (d) is required to be disclosed by the receiving party as a matter of law, court order or subpoena (provided that the receiving party will use all reasonable efforts to provide the disclosing party with prior notice of such disclosure and to obtain a protective order therefore); (e) is disclosed by the receiving party with the disclosing party's written approval; or (f) is independently developed by the receiving party without any use of Confidential Information.

**9.3 Injunctive Relief for Breach.** HealthEdge and Customer acknowledge that any breach of this Section 9 by a receiving party will irreparably harm the disclosing party. Accordingly, in the event of a breach, the disclosing party is entitled to promptly seek injunctive relief in addition to any other remedies that the disclosing party may have at law or in equity.

**9.4 HIPAA Compliance and Use or Disclosure of Protected Health Information.** To the extent that Customer is a Covered Entity (as defined under Section 1171 of HIPAA), the parties acknowledge and agree that the use and disclosure of Protected Health Information (as defined in Schedule B) shall be governed by the terms set forth in the HIPAA Business Associate Agreement between the parties attached hereto as Schedule B. In the event of a conflict between the provisions of the HIPAA Business Associate Agreement and this Section 9, the HIPAA Business Associate Agreement shall control.

**10. Export Controls** Customer may not, and agrees it shall not, export or re-export the Software or Documentation without having all required permits and licenses as may be required under the Export Administration Act of the United States and any amendments thereto, as well as any applicable laws and regulations of the territories outside of the United States.

**11. General**

**11.1 Assignment.** Neither party may assign its rights or delegate its obligations under this Agreement without the other party's prior written consent, which consent will not be unreasonably withheld or delayed, and any attempted assignment or delegation in violation of the foregoing will be void and of no effect. Notwithstanding the foregoing, either party may assign its rights and delegate its obligations hereunder to an acquirer of all or substantially all of its assets or to the surviving entity into which it is merged (the "Acquirer"). In the event that Customer assigns its rights and delegates its obligations to Acquirer under this Agreement, said license to use the Software may continue for Customer's existing clients as well as organic growth of its client base, but shall exclude any of Acquirer's existing members without prior written consent. This Agreement shall be binding upon the successors and assigns of the parties to this Agreement.

**11.2 Entire Agreement.** This Agreement, including all documents expressly incorporated into this Agreement, constitutes the entire agreement between the parties with respect to the subject matter contained herein, superseding all previous agreements pertaining to such subject matter, and may be modified only by an amendment executed in writing by authorized representatives of both parties hereto. All prior agreements, representations, statements, negotiations, understandings and undertakings, whether oral or in writing, are superseded hereby.

**11.3 Amendment; Waiver.** Any amendments, modifications or supplements to this Agreement shall be in writing signed by the authorized representatives of both parties and shall reference this Agreement and identify the specific articles or sections contained herein which are amended, modified or supplemented. The failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of the provisions or of the right of such party thereafter to enforce that or any other provision.

**11.4 Notices.** All notices, demands, or other communications permitted or required hereunder shall be deemed to have been sufficient and duly given if in writing, hand-delivered, sent by facsimile with confirmation of



receipt, sent by first class mail, return receipt requested (for all types of correspondence), postage prepaid, or sent by overnight courier service and addressed as follows:

| | |
|---|---|
| To HealthEdge: | HealthEdge Software, Inc. |
| | 10 Burlington Mall Road |
| | Suite 150 |
| | Burlington, MA 01803 |
| Attn: | Chief Executive Officer |
| Fax no.: | (781) 273-0829 |
| | |
| To Customer: | POMCO, Inc. |
| | 2425 James Street |
| | Syracuse, NY 13206 |
| Attn: | Chief Executive Officer |
| Fax no.: | (315) 433-5450 |

or to such address as the parties may provide to each other in writing from time to time.

**11.5 Publicity**. Without the prior written consent of the other party, neither party shall disclose the terms and conditions of this Agreement, except disclosure may be made as is reasonably necessary to the disclosing party's bankers, attorneys, or accountants or except as may be required by law. Either party is permitted to make a public announcement of the existence and scope of this Agreement without the consent of the other party. Anything in the foregoing to the contrary notwithstanding, HealthEdge shall have the right to include Customer in lists of HealthEdge customers which HealthEdge makes available to the public.

**11.6 Independent Contractor.** Nothing in this Agreement shall be deemed to create an employer/employee, principal/agent, or joint venture relationship. Neither party shall have the authority to enter into any contracts on behalf of the other party.

**11.7 Governing Law**. The validity, construction, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its principles of conflicts of laws.

**11.8 Severability**. If any of the provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render the entire Agreement unenforceable, but rather the entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of HealthEdge and Customer shall be construed and enforced accordingly.

**11.10 Attorney Fees.** In the event of any dispute between the parties arising out of this Agreement, the prevailing party shall be entitled, in addition to any other rights and remedies it may have, to recover its reasonable attorney fees and costs.

**11.11 Force Majeure.** Except for the obligation to make payments, nonperformance of either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts or orders or restrictions, or any other reason where failure to perform is beyond the reasonable control of the nonperforming party.

**11.12 Customer Advisory Board.** HealthEdge agrees that Customer shall have one (1) seat on the HeathEdge Customer Advisory Board or such similar body as may be constituted in the future.



**11.13 Product Roadmap Review**. HealthEdge maintains and updates from time to time, its product roadmap, which contains plans for enhancement of the Software. HealthEdge agrees to allow Customer to review and comment upon this product roadmap.

**11.14 Enhancement to HeathRules Portal**. HealthEdge and Customer agree to work cooperatively to enhance the HealthRules Portal application with the goal of providing additional Client Administrator, Provider and Member views product functionality to benefit HealthEdge's customers including Customer. This includes, but is not limited to, Member driven Open Enrollment functionality that meets POMCO market requirements which will be consistent with traditional requirements of commercially available portal tools in the employee benefits marketplace.

**11.15 References and Site Visits.** Customer agrees to be a reference for HealthEdge prospects including hosting visits to Customer's site, unless it has been mutually agreed to cease.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by an authorized representative.

**HEALTHEDGE SOFTWARE, INC.**                **POMCO, INC.**

By: _____               By: _____

Name: _Bradley K. Desmurais_                Name: _Robert W. Pomfrey_

Title: _CFO_____                Title: _President_____

Date: _March 26, 2010_____                Date: _March 26, 2010_____

## Schedule A
### License and Maintenance Pricing and Terms

The prices below reflect fees for HealthRules Software. It does not include the cost of computer hardware, operating system or relational database software.

| | |
|---|---|
| License fee for HealthRules Payor, Answers and Portal for one production and one test physical environment. | Eighty-Four (84) monthly payments of $22,812.50, subject to the provisions below, with a pre-payment option available prior to the 84 months with no penalty. |
| Maintenance fee for HealthRules Payor, Answers and Portal for one physical production and one physical test environment. | Initially, $8,333.33 per month, subject to the provisions below. |
| One-Time HealthRules startup fee | $58,000 |
| One-Time HealthRules Integration Kit startup fee | $22,000 |
| One-Time startup fee for each additional physical environment beyond production and test. | $35,000 |
| Additional Maintenance fee for additional physical environments beyond production and test . | Initially, $1,000 per month per additional physical environment, subject to the provisions below. |

### Payment Terms

| One – Time start up fees | Due on June 15, 2010 |
|---|---|
| License and Maintenance fees | Due monthly commencing on June 15, 2010 |

1. Monthly invoices for License and Maintenance fees will be due on the first day of each calendar month.
2. The first monthly License and Maintenance fees will be prorated for any partial calendar month of the Term.
3. The Maintenance fee will be increased at each ensuing anniversary of the Effective Date and any renewal, at a rate of the lesser of the United States Consumer Price Index for the prior 12 month period or 5%.
4. All fees provided in this Schedule are subject to terms set forth in Section 5.
5. Software to be provided under this Agreement will consist of the following:
   a. HealthRules Payor, Answers and Portal for two environments
   b. WebLogic (one) for production environment



Page 10 of 13

    c. Flux Scheduler
    d. Melissa Data Address Object for Linux and GeoCoder Object for Linux
    e. HP Exstream Software Dialogue production engine
    f. HealthEdge Integration Suite (which includes):
        i. IXTS iWay Service Manager
        ii. Transformation Engine, TCP/IP & HTTP Listeners
        iii. iWay Business Service Provider [Web Services] publishing system
        iv. IXTW iWay Service Manager Developer Workbench
            1. IEJB iWay Application Systems Adapter for Enterprise Java Beans and Java Objects
            2. IEDI – iWay eBusiness Accelerators for EDIFACT EDI
            3. IHPP  iWay eBusiness Accelerators for HIPAA (X12) EDI

    g. Oracle BEA Weblogic
    h. HP Exstream/Correspondence Software
    i. iWay ETL Software
    j. Advizor Analyst
    k. Flux Scheduling Software: first year
    l. helpIT matching/deduping
    m. MelissaData Address standardization
    n. MelissaData Address geo coder

Software not provided under this agreement but required to operate system includes:

- Red Hat Linux
- Oracle Standard Edition (oltp)
- Microsoft SQL Server or Oracle Standard One (dw)
- Microsoft Windows 2003 R2/Standard (dw and portal)

6. Licensed third party software other than that listed above may be supplied by HealthEdge if HealthEdge is unable to procure the third party software listed herein from its vendors or if other software is determined to meet Customer's needs, provided that any replacement software will provide substantially equivalent functionality.



## Schedule C
## SERVICE LEVELS

HealthEdge agrees to provide Support in accordance with this Service Level Agreement ("**SLA**"). If HealthEdge fails to meet the support response time commitments set forth herein, HealthEdge will immediately institute corrective action, and will diligently and continuously work to correct the problem or restore performance to the minimum level set forth herein as soon as practicable.

### 1. DEFINITIONS

Certain capitalized terms, not otherwise defined in this Schedule C, will have the meanings set forth in the Agreement. The following capitalized terms will have the definitions set forth below:

**1.2** Support shall mean Corrective Services and Software Assistance.

**1.3** "Technical Support Hours" HealthEdge will provide technical support from 9:00AM until 6:00PM ET Monday through Friday, excluding HealthEdge holidays.

**1.4** "Software Assistance" will mean the provision of support to answer routine questions related to the Software.

**1.5** "Corrective Services" will mean the provision of support (i) to assist Customer in identifying and reporting Errors which may need correction; and (ii) to provide work-around solutions or (iii) to deliver Updates containing corrections of Errors.

**1.6** "Error" any problem encountered by Customer in the course of normal and authorized use of the Software which evidences any defect, failure or malfunction in the Software capable of being replicated by HealthEdge.

**1.7** "Named User" an Employee of Customer designated in writing to be a point of contact for purposes of interacting with HealthEdge support personnel. There shall be no more than three (3) Named Users at any one time.

**1.8** Error Severity Levels:

"Severity 1":
- Prevents Customer from using the System in whole or important components thereof
- Materially interrupts claims processing operations
- Evidences material data corruption, unreliability or unavailability in whole or in part,
- Causes a critical business function to be unavailable.

"Severity 2":
- An Incident that impacts Company's operations in which resolution can be addressed during Business Hours and is not a Severity Production system functioning with limited capabilities.

"Severity 3"
- An Incident that impacts Company's operations in a non-material way, and can be addressed on a longer-term, non-urgent basis.

"Severity 4"
- An Incident that inconveniences Company, and can be addressed in a future release based on its low impact to Company operations Errors with little or no impact on business operations of

### 2. PROVISION OF SUPPORT

During the term of this Agreement, HealthEdge will provide Corrective Services to Named Users during Technical Support Hours in response to a report of an Error in accordance with the response times set out in



Page 12 of 13

Section 3 of this SLA. HealthEdge will provide such Corrective Services via telephone, email and via the internet subject to the limitations provided in this SLA and Section 4 of the Agreement. Such support will not be provided to Customer's customers, contractors, agents, or partners or other third parties. Customer agrees to provide adequate information to HealthEdge to assist in the investigation and to confirm that any problems have been resolved. In addition, in the absence of Errors, HealthEdge will provide Software Assistance.

### 3.  RESPONSE TIMES

During Technical Supports Hours, HealthEdge will begin the provision of Corrective Services:

- □ within four (4) hours of receipt by HealthEdge of a message from Customer describing a Severity 1 Error in reasonable detail; or
- ▪ within twenty four (24) hours of receipt by HealthEdge of a message from Customer describing a Severity 2 Error in reasonable detail; or
- ▪ within five (5) business days of receipt by HealthEdge of a message from Customer describing in reasonable detail a Severity 3 or Severity 4 Error

### 4.  INCIDENT RESOLUTION CONTACT PROCEDURES

- ○ By email: Please report all problems via email (24x7) to: support@healthedge.com.  Please include as many details as possible.
    - ○ Subject
    - ○ Company
    - ○ Severity
    - ○ Impact
    - ○ Name
    - ○ Phone
    - ○ Date/time
    - ○ System
    - • Detailed description (user ID Account # or other data)
    - • Return contact information

- ○ By telephone: (781) 285-1333 during business hours (9:00am to 6:00pm).  Please be ready to provide the detailed information highlighted above.

(a) **Assignment of Priority by HealthEdge**. HealthEdge will assign a Severity level to each Error.

(b)   **Escalation by Customer**.  Customer, at its option, may request accelerating Error correction by appealing to HealthEdge's management (a) an Incident that is not progressing in accordance with the response times set forth herein, (b) an Error Severity assignment that Customer does not agree with, or (c) any other failure by HealthEdge to comply with the terms of this Schedule C.  Customer may contact the following individuals at HealthEdge:

- • Escalation Level 1: Technical Support Management
- • Escalation Level 2: Vice President of Professional Services
- • Escalation Level 3: Chief Operating Officer



2

### Professional Services Agreement

This Professional Services Agreement ("Agreement") is entered into as of the 1st day of April, 2010 (the "Effective Date"), by and between HealthEdge Software, Inc. ("HealthEdge"), a Delaware corporation with its principal place of business at 10 Burlington Mall Road, Suite 150, Burlington, MA 01803, and POMCO, Inc., a New York corporation with its principal place of business at 2425 James Street, Syracuse, NY 13206 ("Customer").

#### Recitals

A.      HealthEdge has certain skills and abilities with respect to healthcare payor technology and business operations.

B.      Customer desires to retain HealthEdge as an independent contractor to perform the services described herein ("Services").

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

#### 1.      Implementation

The parties shall develop a Statement of Work ("SOW") defining the services to be performed by HealthEdge. Each SOW shall be signed by an authorized representative of HealthEdge and Customer and shall thereby be incorporated into and form a part of this Agreement.

#### 2.      SOW and Project Plan

HealthEdge and Customer will jointly prepare a mutually agreed upon Project Plan as outlined in the SOW. Where there is more than one SOW attached to this Agreement, each describing a different type of service and associated Deliverables (as defined below) to be provided by HealthEdge to Customer, each SOW will be subject to the terms and conditions of this Agreement. The SOW and Project Plan may include:

(a)     a detailed list of the steps, and a non-binding estimate of the schedule and cost necessary to complete the implementation of the SOW;

(b)     a listing of all items to be delivered to Customer under the SOW (the "Deliverables"), and the functions to be performed by such Deliverable; and

(c)     acceptance test criteria ("Acceptance Test Criteria") and an acceptance test plan ("Acceptance Test Plan") for each of the Deliverables.

Changes to the Deliverables, the SOW or the Project Plan shall require the written consent of Customer and HealthEdge, such consent not to be unreasonably withheld. Any such mutually agreed change shall be evidenced in writing signed by authorized representatives of Customer and HealthEdge, whereupon HealthEdge shall commence performance in accordance with it.

#### 3.      Excusable Delays

Any delay or nonperformance of any provision of this Agreement caused by conditions beyond the reasonable control of the delayed party shall not constitute a breach of or default under this Agreement, provided that such party has taken reasonable measures to notify the other party of the delay. Conditions beyond a party's reasonable control include, but are not limited to, natural disasters, acts of government after the date of the Agreement, power failure, fire, flood, acts of God, labor disputes not involving the delayed parties employees, epidemics, riots, and acts of war or terrorism.

#### 4.      Cooperation and Assistance of Customer

As a condition precedent to HealthEdge's rendering of the Services, Customer shall provide to HealthEdge such active and timely assistance and cooperation as reasonably required or requested in order for HealthEdge to perform the Services including, but not limited to, supplying qualified personnel, relevant information and access to Customer premises and systems.

#### 5.      Compensation

HealthEdge shall be compensated at the rate specified in each SOW for time spent by its employees or agents actually performing Services within the scope of the SOW and Project Plan.

Customer shall reimburse HealthEdge for all reasonable, out-of-pocket expenses incurred by HealthEdge in performing the Services, including, but not limited to travel to client site and to HealthEdge site by HealthEdge consultants working on the project, lodging, meals, auto rental, communications charges, media costs (tapes and disks), printing and duplication

expenses.

HealthEdge shall provide an itemized invoice to Customer no more frequently than bi-weekly for time and expense charges. Payment will be made within thirty (30) days of the invoice date. In the event of any dispute regarding a portion of an invoice, the undisputed portion shall be paid as provided herein. Amounts not paid on their due date shall bear interest at the lesser of 1.5% per month or the highest amount allowed by law. If any amount is not paid when due hereunder, Customer shall pay or reimburse all federal, state and local taxes (exclusive of taxes on HealthEdge's net income) and assessments arising on or measured by amounts payable to HealthEdge under this Agreement, or furnish HealthEdge with evidence acceptable to the taxing authority to sustain an exemption therefrom.

## 6.    Ownership of Intellectual Property

Each party shall own all right, title and interest in and to its existing techniques, processes, methods, designs, software, and know-how, and all intellectual property rights related thereto, as of the Effective Date.

Except for the HealthEdge Knowledge (as defined below), each Deliverable is a "work made for hire" as that term is defined under U.S. copyright law, and Customer shall own all copyrights in such Deliverable. Except as set forth below, HealthEdge hereby grants Customer all of its right, title and interest to such Deliverable. HealthEdge shall execute all documents reasonably necessary to legally establish Customer's ownership of such Deliverable. HealthEdge shall retain copies of such Deliverable(s) solely for the purpose of supporting Customer.

Notwithstanding anything to the contrary in this Agreement, the parties recognize that HealthEdge's work under this project will take advantage of information in tangible and intangible form, including but not limited to form documents, software, processes, methodologies, techniques, concepts and know-how (hereinafter called "HealthEdge Knowledge") developed and learned by HealthEdge's personnel in the course of performing Services hereunder. In addition, the parties acknowledge that the on-going business of HealthEdge and its performance of Services, including Deliverables produced under an applicable SOW, may continuously lead to the creation of new development tools, routines, subroutines, web-centric programs, and other programs, data and materials and to refinements, changes, enhancements and modifications to the HealthEdge Knowledge, all of which shall be included in the meaning of HealthEdge Knowledge.

All Intellectual Property Rights in and to such HealthEdge Knowledge shall remain with HealthEdge, and HealthEdge shall have the unlimited right to use such HealthEdge Knowledge, including without limitation any HealthEdge Knowledge utilized in the performance of Services and included in the Deliverables. "Intellectual Property Rights" shall mean all intellectual property or other proprietary rights (including without limitation copyrights, patents rights, trade secret right, rights of reproduction, trademark rights, rights of publicity, and the right to secure registrations, renewals, reissues, and extensions thereof). HealthEdge hereby grants to Customer a non-exclusive, worldwide, perpetual license to make, use, copy, publicly display and perform the HealthEdge Knowledge (solely as incorporated in the Deliverables). Customer hereby grants to HealthEdge a non-exclusive, royalty free, fully paid up, worldwide, perpetual license (without right to sublicense) to make, use, copy, modify, publicly display, and perform, import, sell, offer to sell, and distribute the Deliverables provided that HealthEdge may not directly disclose Customer Confidential Information embedded therein. Customer acknowledges that it has licensed Software from HealthEdge, which is proprietary to HealthEdge, pursuant to the terms of the License Agreement(s). Customer acknowledges that nothing in this Agreement shall be construed to alter or amend the terms of the License Agreement(s).

## 7.    Confidentiality

Customer acknowledges that the HealthEdge Knowledge, and all information relating to the business and operations of HealthEdge that Customer learns or has learned during or prior to the term of this Agreement, is the valuable, confidential, and proprietary information of HealthEdge (or is licensors and suppliers). HealthEdge acknowledges that the data and information relating to the business and operations of Customer that HealthEdge learns or has learned during or prior to the term of this Agreement, may be the valuable, confidential, and proprietary information of Customer. For purposes of this Agreement, "Confidential Information" shall mean all written, electronic or oral information, disclosed by either party to the other, related to the operations of either party or a third party that has been identified as confidential or that by the nature of the information or the circumstances surrounding disclosure ought reasonably to be treated as confidential. During the period this Agreement is in effect, and at all times afterwards, each party, and its employees, contractors, consultants, and agents, will (a) safeguard the Confidential Information of the other party with the same degree of care that it uses to protect its own confidential information, which in any event shall be no less than a reasonable degree of care; (b) maintain the confidentiality of this information; (c) not use the Confidential Information except as permitted under this Agreement; and (d) not disseminate, disclose, sell, publish, or otherwise make available the Confidential Information to any third party without the prior written consent of the other party.

This Section does not apply to any information that (a) is already lawfully in the receiving party's possession (unless received pursuant to a nondisclosure agreement); (b) is disclosed to the receiving party by a third party who may transfer or disclose such information without restriction; (c) is required to be disclosed by the receiving party as a matter of law, court order or subpoena (provided that the receiving party will use all reasonable efforts to provide the disclosing party with prior notice of such disclosure and to obtain a protective order therefore); (d) is disclosed by the receiving party with the disclosing party's written approval; or (e) is independently developed by the receiving party without any use of Confidential Information. In all cases, the receiving party will use all reasonable efforts to give the disclosing party thirty (30) days prior written notice of any disclosure of information under this Agreement. The parties will indefinitely maintain the confidentiality of all confidential and proprietary information learned pursuant to this Agreement after the date of termination or expiration of this Agreement.

The parties acknowledge that any breach of this Section 7 by a receiving party will irreparably harm the disclosing party. Accordingly, in the event of a breach, the disclosing party is entitled to promptly seek injunctive relief in addition to any other remedies that the disclosing party may have at law or in equity.

## 8. Disclaimer of Warranty; Limitation of Liability

THIS AGREEMENT DOES NOT CREATE ANY WARRANTY OF ANY KIND. HEALTHEDGE DISCLAIMS ALL WARRANTIES, STATUTORY, EXPRESS, IMPLIED OR ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, WITH RESPECT TO OR RELATED TO THE SERVICES OR DELIVERABLES PROVIDED UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO, ANY WARRANTY OF DESIGN, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

HEALTHEDGE SHALL NOT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES, ARISING FROM OR RELATED TO THIS AGREEMENT OR THE SERVICES OR DELIVERABLES PROVIDED HEREUNDER, REGARDLESS OF THE FORM OF ACTION, INCLUDING, WITHOUT LIMITATION, DAMAGES ARISING FROM LOSS OF DATA OR PROGRAMMING, LOSS OF REVENUE OR PROFITS, FAILURE TO REALIZE SAVINGS OR OTHER BENEFITS, DAMAGE TO EQUIPMENT, AND CLAIMS AGAINST CUSTOMER BY ANY THIRD PERSON, EVEN IF HEALTHEDGE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, HEALTHEDGE'S TOTAL AGGREGATE LIABILITY UNDER THIS AGREEMENT SHALL NOT BE GREATER THAN THE TOTAL AMOUNTS ACTUALLY RECEIVED BY HEALTHEDGE PURSUANT TO THE TERMS OF THIS AGREEMENT FOR THE ONE YEAR PERIOD IMMEDIATELY PRIOR TO THE DATE OF THE EVENT GIVING RISE TO SUCH LIABILITY.

## 9. Term of Agreement

9.1 **Initial Term.** Unless terminated earlier as provided elsewhere herein, this Agreement shall have an initial term of five (5) years, commencing on the Effective Date, provided, however, all SOW's outstanding at the time of such termination shall continue to be governed by the terms and conditions of this Agreement.

9.2 **Renewal.** Provided that Customer is not then in material breach of this Agreement, Customer may give notice to HealthEdge at least six months prior to the expiration of the term of this Agreement that Customer wishes to renew the Agreement for a renewal term of one (1) year. Within thirty (30) days after receiving such notice, HealthEdge shall notify Customer of any change in fees hereunder, to take effect for the renewal term. Within thirty (30) days after receiving such notice from HealthEdge, Customer may notify HealthEdge that it does not wish to renew the Agreement. Unless such second notice by Customer is timely given, this Agreement shall be renewed for a term of one year, subject to the price adjustments set forth in HealthEdge's notice. This procedure may be repeated upon expiration of any renewal term, and the term of this Agreement is thereby further renewed.

### 9.3 Termination

This Agreement may be terminated as follows:

(a) For cause by HealthEdge, immediately, if Customer fails to pay the amounts due HealthEdge pursuant to this Agreement or the Application Service Provider/License Agreement of even date herewith and such failure is not cured within thirty (60) days of written notice to Customer,

(b) For cause by HealthEdge, upon forty-five (60) days written notice, if Customer has committed a material breach of this Agreement, other than failure to make payments, that is not cured within forty-five (60) days,

(c) By either party, immediately upon written notice, if (i) all or a substantial portion of the assets of the other party are transferred to an assignee for the benefit of creditors, to a receiver, or to a trustee in bankruptcy, (ii) a proceeding is commenced by or against the other party for relief under bankruptcy or similar laws and such proceeding is not dismissed

within 60 days, or (iii) the other party is adjudged bankrupt.

(c)     For convenience by Customer for any reason at any time with or without cause upon fifteen (15) days written notice.

If customer requests HealthEdge to cease work on any SOW for a period of greater than 30 days or, through its inaction or failure to provide access to personnel or information, prevents work on any SOW from progressing, such SOW will be considered complete and terminated.

Customer acknowledges that any termination will not relieve it of its obligations to pay for Services rendered through the date of such termination. Sections 5, 6, 7, 8, 10 and 11 shall survive the termination or expiration of this Agreement.

**10.     Non-solicitation.** Neither party may hire or solicit the employees of the other party during the term of this Agreement and for a period of one (1) year after the expiration or termination of this Agreement.

**11.     General Provisions**

**11.1     Assignment.** Neither party may assign its rights or delegate its obligations under this Agreement without the other party's written consent, which will not be unreasonably withheld, provided that either party may assign its rights and delegate its obligations hereunder to an acquirer of all or substantially all of its assets or to the surviving entity into which it is merged. This Agreement shall be binding upon the successors and assigns of the parties to this Agreement.

**11.2     Amendments and Waivers.** Any amendments, modifications or supplements to this Agreement shall be in writing signed by the authorized representatives of both parties and shall reference this Agreement and identify the specific articles or sections contained herein which are amended, modified or supplemented. The failure of either party to enforce any provision of this Agreement shall not be deemed a waiver of the provisions or of the right of such party thereafter to enforce that or any other provision.

**11.3     Independent Contractor.** All work performed by HealthEdge in connection with this Agreement shall be performed by HealthEdge as an independent contractor and not as the agent or employee of Customer. Nothing in this Agreement shall be deemed to create an employer/employee, principal/agent, or joint venture relationship. Neither party shall have the authority to enter into any contracts on behalf of the other party. HealthEdge shall be solely responsible for compliance with all rules, laws and regulations relating to employment of labor, hours of labor, working conditions, payment of wages, and payment of taxes, such as employment, Social Security, and other payroll taxes including applicable contributions from such persons when required by law.

**11.4     Security, Access and Safety Requirements.** HealthEdge shall instruct its employees, agents and subcontractors that they shall comply with Customer's security, access and safety requirements for the protection of Customer's facilities and employees while on Customer's premises.

**11.5     Governing Law.** The validity, construction, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to its principles of conflicts of laws.

**11.8     Severability.** If any of the provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render the entire Agreement unenforceable but rather the entire Agreement shall be construed as if not containing the particular invalid or unenforceable provision or provisions, and the rights and obligations of HealthEdge and Customer shall be construed and enforced accordingly.

**11.9     Notice.** All notices, demands, or other communications permitted or required hereunder shall be deemed to have been sufficient and duly given if in writing, hand-delivered, sent by facsimile with confirmation of receipt, sent by First Class Mail, return receipt requested (for all types of correspondence), postage prepaid, or sent by overnight courier service and addressed as follows:

Notices to Customer:     POMCO, Inc.

                                        2425 James Street

                                        Syracuse, NY 13206

                                        Attn: Chief Executive Officer

                                        Fax no.: (315) 433-5450

Notices to HealthEdge: HealthEdge, Inc.

10 Mall Road, Suite 150

Burlington, MA 02492

Attn: Chief Executive Officer

Fax: (781) 272 5690

or to such address as the parties may provide to each other in writing from time to time.

**11.10    Publicity.** Without the prior written consent of the other party, neither party shall disclose the terms and conditions of this Agreement, except disclosure may be made as is reasonably necessary to the disclosing party's bankers, attorneys, or accountants or except as may be required by law. Anything in the foregoing to the contrary notwithstanding, HealthEdge shall have the right to include Customer in lists of HealthEdge customers which HealthEdge makes available to the public.

**11.11    Entire Agreement.** This Agreement, including all documents expressly incorporated into this Agreement, constitutes the entire agreement between the parties with respect to the subject matter contained herein, superseding all previous agreements pertaining to such subject matter, and may be modified only by an amendment executed in writing by authorized representatives of both parties hereto. All prior agreements, representations, statements, negotiations, understandings and undertakings, whether oral or in writing, are superseded hereby. The terms and conditions contained in any purchase order issued by Customer shall be of no force or effect, even if the order is accepted by HealthEdge. Both parties hereto represent that they have read this Agreement, understand it, agree to be bound by all terms and conditions stated herein, and acknowledge receipt of a signed, true and exact copy of this Agreement.

**11.12    Counterparts.** This Agreement may be executed by the parties in separate counterparts which taken together shall constitute a single instrument.

IN WITNESS HEREOF, and intending to be legally bound, the authorized representatives of the parties hereof have executed this Agreement below:

**HEALTHEDGE SOFTWARE, INC.**

By: _____

Name: _Bradley k Desmarais_

Title: _CFO_

Date: _April 1, 2010_

**POMCO, INC.**

By: _____

Name: _Robert W. Pomfrey_

Title: _President & CEO_

Date: _4/1/2010_

Schedule A

Statement of Work #1
(Attached)

# Statement of Work #1

## POMCO Group

March 23rd, 2010



# Statement of Work #1

## Contents

Contents ............................................................................................................................................ 1

1.    Overview.................................................................................................................................... 3

2.    Approach.................................................................................................................................... 3

  2.1.    Project Planning ................................................................................................................ 3

  2.2.    System Integration and Interfaces.................................................................................... 3

  2.3.    System Conversion............................................................................................................ 4

  2.4.    System Configuration........................................................................................................ 4

  2.5.    Business Process Improvement ........................................................................................ 4

  2.6.    Training ............................................................................................................................. 5

3.    Scope of Services ...................................................................................................................... 5

  3.1.    Project Planning ................................................................................................................ 5

  3.2.    Systems Integration and Interfaces .................................................................................. 5

  3.3.    System Conversion............................................................................................................ 5

  3.4.    System Configuration........................................................................................................ 5

  3.5.    Business Process Improvement ........................................................................................ 7

  3.6.    Training ............................................................................................................................. 8

4.    Deliverables .............................................................................................................................. 8

  4.1.    Implementation Approach................................................................................................ 8

  4.2.    Implementation and Project Management Framework ................................................... 8

  4.3.    System Installation and Environment Management Plan ................................................. 9

  4.4.    Approach for Test Case Scenario Creation....................................................................... 9

  4.5.    Scope of System Conversion............................................................................................. 9

  4.6.    Scope of Interfaces........................................................................................................... 9

  4.7.    Scope of System Configuration ........................................................................................ 9

  4.8.    Business Process Improvement Plan .............................................................................. 10

  4.9.    Training Plan.................................................................................................................... 10

5.    Customer Obligations ............................................................................................................. 10

6.    General Assumptions............................................................................................................... 10

7.    Change Control ....................................................................................................................... 11

8.    Estimated Costs ...................................................................................................................... 11

# Statement of Work #1

| 9. | Proposed Project Plan and Timeline | 11 |
| | 9.1. | Project Plan | 13 |
| 10. | Acceptance Criteria | 15 |
| 11. | Work Estimates and Customer Cooperation | 15 |
| 12. | Term and Termination | 15 |
| 13. | Approvals | 16 |

# Statement of Work #1

## 1. Overview

This Statement of Work ("SOW") is incorporated into and forms a part of the Professional Services Agreement ("Agreement") by and between HealthEdge Software, Inc. ("HealthEdge") and POMCO Group ("Customer").

This Statement of Work presents the detailed work descriptions and estimated level of effort to conduct the solution analysis, design, and project planning that is required in order to arrive at a second Statement of Work that will be used to govern Customer's initial implementation ( the "Model Office Implementation") of HealthRules Payor and HealthRules Answers (the "Implementation Statement of Work"). These work descriptions and estimated levels of effort are based upon known requirements and assumptions related to the availability of data, systems, and resources. These work descriptions and estimated levels of effort may be updated during the conduct of this Statement of Work as new information becomes available, requirements change, and/or scope is modified.

## 2. Approach

HealthEdge will lead a series of working sessions with Customer's staff at Customer's site. HealthEdge project team members will interview Customer's staff, asking questions pertinent to system implementation activities, as they work to gather all business and technical requirements. Additionally, HealthEdge project team members, working closely with Customer's staff, will review pertinent documentation, artifacts, data, and integration files, and will observe Customer's business and technical operations as they exist today. Customer will be responsible for providing qualified resources to work with HealthEdge team members during these working sessions.

Information gathering and Customer interactions will be centered on the following areas:

### 2.1. Project Planning

HealthEdge will schedule a series of working sessions with Customer to create a project plan and timeline to govern the implementation of HealthRules Payor and HealthRules Answers (the "HealthRules system").

### 2.2. System Integration and Interfaces

In order to accurately scope and plan for system integration and the interfaces that will be needed as part of the implementation of the HealthRules system, HealthEdge will schedule a series of working sessions with Customer staff to inventory all current interfaces. Once all existing interfaces have been inventoried, HealthEdge will work with Customer to review each interface, in order to determine which of these interfaces will need to be retained. Interfaces that are determined to be required in the new HealthRules environment will be included in the system integration body of work. Additionally, the need for any new

---

## Statement of Work #1

interfaces will be determined during these sessions, along with their resulting purpose and scope.

### 2.3. System Conversion

In order to accurately scope and plan for system conversion, HealthEdge will schedule a series of working sessions with Customer to assess the various sources of conversion data and to determine the best approach for moving all required data into the HealthRules system.

### 2.4. System Configuration

In order to accurately scope and plan for system configuration, HealthEdge will schedule a series of working sessions with Customer to gather initial requirements to help plan for and determine the following:

- Set up of "Health Insurance Company" (HIC) configuration. This includes company-wide policies, reporting hierarchies, and values for drop-down lists and reason codes.
- Set up of employer groups.
- Set up of membership.
- Set up of service categories. These will be used in benefit plans and provider contracts to identify which services each rule applies to.
- Set up of benefit plans. This will include all rules around members' benefits.
- Set up of provider demographics and contracts.
- Set up of authorization processing. This will include setting up referral categories.
- Set up of call tracking. This will include setting up all hierarchical reason codes and call types and configuring all custom fields.
- Set up of premium billing. This will include setting up all rates and billing cycles.
- Set up of claims processing. This will include setting up all rules for claim processing that are not a part of the benefit plans and provider contracts. This will also include setting up any edit policies and message codes around claims.

### 2.5. Business Process Improvement

In order to accurately scope and plan for the facilitation of various business process improvements, HealthEdge will schedule a series of working sessions with Customer to determine the best approach for improving business processes alongside the implementation of the HealthRules system.

# Statement of Work #1

## 2.6. Training

In order to accurately scope and plan for training, HealthEdge will schedule a series of working sessions with Customer to determine the best approach for training Customer's end-user staff in the use of the HealthRules system.

Additionally, HealthEdge will work with Customer to determine the best approach for training Customer's configuration staff in the use of HealthRules Designer. The intent of this training is to work with Customer to develop a competency so that Customer gains the ability to update and maintain their system configuration on an ongoing basis.

## 3. Scope of Services

This Statement of Work engages HealthEdge to provide Customer with resources to gather information related to current Customer business processes and to determine the cost, timeline, and resources required to fully implement the HealthRules system in the Customer's environment.

During the conduct of this Statement of Work, the following areas will be evaluated:

### 3.1. Project Planning

Project planning will include the work required to finalize the scope, budget, work plan, and schedule for Customer's Model Office Implementation.

### 3.2. Systems Integration and Interfaces

Systems integration and interfaces will include inventorying Customer's existing interfaces within the current QicLink, !POMCO, QRIMS, DP2_WIP, and DP2 enterprise computing environments and determine which interfaces will be needed once the HealthRules system is in place.

### 3.3. System Conversion

System conversion will include an assessment of Group, Member, Provider, Authorization, Claims, Fee Schedules, Premium Billing, and Call Tracking data and data sources, and will include an assessment of ongoing data maintenance related to data sources that may need to coexist and be shared for some period of time between Customers legacy systems and the HealthRules system.

### 3.4. System Configuration

System configuration involves gathering all business requirements related to the configuration of the HealthRules system and will include, but not be limited to, the following areas and evaluation:

- COBRA processing requirements, which will include a process flow, qualification criteria, and billing requirements specific to COBRA.
- Sample check and remittance for broker payments.

# Statement of Work #1

- Sample broker reports.
- Sample enrollment related forms (other insurance information, COBRA qualifying events, enrollment face sheets, etc.).
- Employer and membership enrollment processes and policies.
- Summary Plan Documents (SPDs) for all plans administered.
- Amendments or Riders for all plans administered.
- Current definitions, lists, or coding of "benefit categories".
- Sample facility contracts that represent the majority of Customer's facility provider network.
- Sample physician contracts (specialty contracts) that the majority of Customer's facility provider network.
- Current definitions/coding for "pricing provision categories".
- Sample fee schedules.
- Claims processing processes and policies.
- Sample claim check, remittance, and check register
- Sample member EOBs.
- Sample provider RAs.
- 837 and 835 implementation/companion guides
- Claim Edit codes.
- Claim payments and remarks codes.
- Sample billing invoice(s).
- Admin/service fee structures.
- Sample reinsurance contract(s).
- Sample reinsurance claim reporting.
- Reinsurance process definition.
- Listing of production reports with brief business description.
- Listing of production correspondence with brief business description.
- Sample ID cards.
- Sample member packets.
- Sample letters for replacement cards, etc.

## Statement of Work #1

- Sample letters for employer groups and member.
- Sample COBRA packets.

### 3.5. Business Process Improvement

This will include determining how HealthEdge will work with Customer to help enable improvements to Customer's business processes during the HealthEdge led iterative approach for implementing the HealthRules system. HealthEdge acknowledges that Customer has a number of business processes and workflows that are byproducts of their legacy system environment that Customer does not want to replicate and instead wants to eliminate or improve.

Business process improvement determination will include, but not be limited to, the following areas and evaluation:

- How Customer will define the various current ("As-Is") business processes and workflows that align with each of the iterations ("Sprints") of the system.
- How HealthEdge will provide visibility and transparency into the features, configuration, and capabilities of the system so Customer can make good business process improvement decisions and can re-engineer As-Is business processes accordingly.
- What role HealthEdge will play as system representative in Customer's business process improvement analysis, design, and review sessions.
- How HealthEdge will facilitate and communicate knowledge transfer regarding best practices gleaned from prior implementations and industry standards.
- How Customer will engineer business process improvements within each of the Sprints and how HealthEdge will provide its review and advice on Customer's re-engineered business processes in accordance with the following key deliverables:
  - o Thoroughly understanding what the As-Is business processes are in order for these processes to be used as foundation upon which the future ("To-Be") processes can be developed.
  - o Analyzing and then developing the optimal To-Be Processes, including HealthEdge recognized best practices and the incorporation of the HealthRules system functionality being implemented.
  - o Identifying functional gaps between the To-Be process and the HealthRules system.
  - o Categorizing and prioritizing gaps within the context of the Model Office implementation.
  - o Configuring the HealthRules system to remediate gaps accordingly.

# Statement of Work #1

- ° How HealthEdge will provide recommendations for Customer's organizational staffing model in support of the HealthRules system and its configuration capabilities using the HealthRules Language and other tool or system-based capabilities.

- ° How Customer will test and then assimilate business process improvements prior to go-live with the Model Office Implementation.

## 3.6. Training

This will include the gathering of business requirements related to training of the Customer's staff on the use and maintenance of the HealthRules system.

# 4. Deliverables

Deliverables under this Statement of Work will be as follows.

## 4.1. Implementation Approach

The implementation approach will put forth the framework that HealthEdge and Customer will use to implement the HealthRules system. HealthEdge typically employs an iterative implementation approach that helps to minimize project risk by decomposing the implementation into easily achieved sets of objectives and providing frequent milestones by which to measure the speed and effectiveness of the implementation effort. This iterative approach to implementation provides ongoing product knowledge transfer to Customer staff through repeated cycles of design and configuration, and it allows the project team to constantly evaluate the evolving implementation effort while ensuring constant feedback to and from all project stakeholders. The primary objective of this approach is to ensure that Customer experiences a timely, cost-effective and predictable deployment of the HealthRules system that ensures a smooth and successful transition to self-sufficient operation.

## 4.2. Implementation and Project Management Framework

A framework will be created that will define how HealthEdge and Customer will ensure proper implementation oversight and project management. It will include the following elements:

- A plan for managing the HealthEdge resources to achieve the completion of all assigned tasks.

- A plan for managing Customer resources to achieve the completion of all assigned tasks.

- A project plan that reflects the implementation scope, tasks, resources, and delivery schedule.

- A list of assumptions related to required Customer resources that is tied directly to the agreed upon project plan.

## Statement of Work #1

- A project communication process that will include updates on progress against plan, status of all current tasks, and updates to implementation risks in order of potential and impact.

- A formal change management program that will be used during the implementation cycle.

- A formal issues log and issues reporting process, that will be used during the delivery of the tasks identified in the Implementation Statement of Work.

### 4.3. System Installation and Environment Management Plan

The system installation and environment management plan will set forth the plan for the installation of the HealthRules system.

Additionally, this plan will define the process for delivering services, including the management of environments to facilitate rebuilds, upgrades, and all related version control management, configuration refreshes, and data management.

### 4.4. Approach for Test Case Scenario Creation

HealthEdge will work with Customer to establish an approach for defining a set of test case scenarios. These test case scenarios will help to clarify the implementation requirements. They will also be used by HealthEdge for testing the conversion, interfaces, and configuration, and by the Customer for acceptance testing of the work product. By defining these tests up front and automating them, HealthEdge and Customer will be able to identify miscommunications and defects earlier in the delivery process.

### 4.5. Scope of System Conversion

HealthEdge will work with Customer to scope all conversion services. This will include the sourcing and provisioning of conversion data, and the packaging and presentation of data to HealthEdge for its conversion into the HealthRules system.

### 4.6. Scope of Interfaces

HealthEdge will work with Customer to scope interfaces, including interfaces within the current QicLink, !POMCO, QRIMS, DP2_WIP, and DP2 enterprise computing environments, and any additional interfaces that will be needed when the HealthRules system is implemented within Customer's enterprise computing environment.

### 4.7. Scope of System Configuration

HealthEdge will work with Customer to scope system configuration services related to the set up of "Health Insurance Company" (HIC) configuration, service categories, employer groups, member enrollment, benefit plan components and templates, provider demographics and contracts, authorization processing, call tracking, premium billing, and claims. This will also include setting up any edit policies and message codes for system processing, reporting and correspondence generation.

## Statement of Work #1

### 4.8. Business Process Improvement Plan
HealthEdge will work with Customer to develop a plan for facilitating business process improvement alongside the implementation of the HealthRules system.

### 4.9. Training Plan
HealthEdge will work with Customer to develop a training curriculum and related plan for training Customer's staff can in the use of the HealthRules system.

## 5. Customer Obligations
For the term of this Statement of Work, Customer acknowledges that HealthEdge's ability to perform services as agreed to in this Statement of Work depends on Customer's fulfillment of the following obligations. Customer obligations may be updated during the conduct of this Statement of Work as new information becomes available, requirements change, and/or scope is modified.

- Customer will provide HealthEdge timely access to Customer's facilities, equipment, technology and personnel required by HealthEdge to perform services associated with this Statement of Work.

- Customer will be responsible for providing business and technical requirements and ensuring that these requirements meet Customer's legal compliance requirements.

- Customer will be responsible for providing pertinent documentation, artifacts, data, and integration files.

- Customer will dedicate qualified resources to delivery of this Statement of Work. These resources will participate in and perform tasks associated with this Statement of Work.

- Customer will ensure the timely availability of subject matter experts.

- Customer will review, validate, and upon request, provide timely written acceptance for all work associated with this Statement of Work.

## 6. General Assumptions
General assumptions may be updated during the conduct of this Statement of Work as new information becomes available, requirements change, and/or scope is modified.

- Customer will provide clear business and technical requirements.

- Customer will provide sufficient subject matter experts and collateral documentation in a timely manner.

- Customer will make decisions and respond to questions with a reasonable turnaround time.

- HealthEdge resources assigned to the work provided in the Statement of Work may not always be solely dedicated to Customer.

# Statement of Work #1

## 7. Change Control

Should a change to any accepted and agreed to deliverables and/or terms of this Statement of Work be necessary, a change control request must be processed in accordance with the terms below:

- Requested change(s) should be made to the HealthEdge Project Manager as soon as it is identified.

- The HealthEdge Project Manager will evaluate the feasibility of accommodating the requested change(s) in the current Statement of Work and identify the associated costs and/or schedule changes, if required in either case, in order to include with the requested changes(s).

- The HealthEdge Project Manager will complete a Project Change Request document (PCR) and deliver it to Customer for review and acceptance. This document details any cost, schedule or deliverable changes to accommodate the change(s).

- Customer will have the option to either accept or deny the terms of the PCR. Should the PCR be rejected, the change request will be considered void and no longer desired, in which case this Statement of Work will be delivered according to the previously accepted terms and deliverables and without the requested change(s).

- A PCR that is not accepted or denied within 48 hrs of delivery to Customer (via email or overnight courier) will be deemed as "denied," in which case the Statement of Work will be delivered according to the previously accepted terms and deliverables and without the requested change(s).

- If the PCR is accepted and executed by both parties to this Statement of Work, the PCR becomes a permanent addendum to the Statement of Work

- Any changes outlined within an accepted PCR are immediately considered part of the Statement of Work and the deliverables of the original Statement of Work must be adjusted accordingly to include the change(s) outlined within the accepted PCR.

## 8. Estimated Costs

HealthEdge will provide an estimated 106 billable staff days of work under this Statement of Work and in doing so will deploy up to five (5) Consultants during its term.

Resources for the implementation will be billed on a time and materials basis at the rate of $150.00 per hour plus travel and lodging expenses.

Customer understands and acknowledges the critical importance of face-to-face meetings and communication during the conduct of this engagement.

## 9. Proposed Project Plan and Timeline

Customer agrees that its obligations to meet the agreed-upon Project Plan and Timeline are of the essence and failure to deliver resources or complete tasks to meet the Project Plan and Timeline or

## Statement of Work #1

respond to requests in timely fashion could cause delays or potential project cost overruns. Such delays could also cause resources attached to the project to be reassigned to other projects.

It is intended that this Statement of Work will be conducted over the course of 7 consecutive weeks in accordance with a mutually agreeable start date between the parties and the availability of Customer's sufficient subject matter experts and collateral documentation during the course of this schedule.

The proposed Project Plan and Timeline may be updated during the conduct of this Statement of Work as new information becomes available, requirements change, and/or scope is modified.

# Statement of Work #1

## 9.1.  Project Plan

| Task Name | Duration | Billable Days | Start | Finish | Predecessor |
|---|---|---|---|---|---|
| POMCO Group Statement of Work #1 | 35 days | 111 days | 04/19/10 | 06/07/10 | |
| System Integration and Interfaces | 20 days | 40 days | 04/19/10 | 05/14/10 | |
| Inventory Current Interfaces | 2 days | 4 days | 04/19/10 | 04/20/10 | |
| Review Current Interfaces | 5 days | 10 days | 04/21/10 | 04/27/10 | 3 |
| Determine Required HealthRules Environment Interfaces | 5 days | 10 days | 04/28/10 | 05/04/10 | 4 |
| Scope Required HealthRules Environment Interfaces | 8 days | 16 days | 05/05/10 | 05/14/10 | 5 |
| System Conversion | 10 days | 10 days | 04/19/10 | 04/30/10 | |
| Group | 1 day | 1 day | 04/19/10 | 04/19/10 | |
| Member | 1 day | 1 day | 04/20/10 | 04/20/10 | 8 |
| Provider | 2 days | 2 days | 04/21/10 | 04/22/10 | 9 |
| Authorization | 1 day | 1 day | 04/23/10 | 04/23/10 | 10 |
| Claims | 2 days | 2 days | 04/26/10 | 04/27/10 | 11 |
| Fee Schedules | 1 day | 1 day | 04/28/10 | 04/28/10 | 12 |
| Premium Billing | 1 day | 1 day | 04/29/10 | 04/29/10 | 13 |
| Call Tracking | 1 day | 1 day | 04/30/10 | 04/30/10 | 14 |
| System Configuration | 20 days | 31 days | 04/19/10 | 05/14/10 | |
| Health Insurance Company Information | 1 day | 2 days | 04/19/10 | 04/19/10 | |
| Employer Groups | 0.5 days | 0.5 days | 04/20/10 | 04/20/10 | 17 |
| Service Categories | 2 days | 4 days | 04/20/10 | 04/22/10 | 18 |
| Benefit Components and Templates | 4 days | 8 days | 04/22/10 | 04/28/10 | 19 |
| Member Enrollment | 0.5 days | 0.5 days | 04/28/10 | 04/28/10 | 20 |
| Premium Billing | 2 days | 2 days | 04/29/10 | 04/30/10 | 21 |
| Provider Demographics | 0.5 days | 0.5 days | 05/03/10 | 05/03/10 | 22 |
| Provider Contracts | 4 days | 8 days | 05/03/10 | 05/07/10 | 23 |
| Authorization Rules and Code Sets | 1 day | 1 day | 05/07/10 | 05/10/10 | 24 |
| Claim Processing Rules and Edits | 2.5 days | 2.5 days | 05/10/10 | 05/12/10 | 25 |
| Call Tracking Code Sets | 2 days | 2 days | 05/13/10 | 05/14/10 | 26 |
| Training | 5 days | 5 days | 04/19/10 | 04/23/10 | |
| End-User Training Planning | 3 days | 3 days | 04/19/10 | 04/21/10 | |
| Configuration Training Planning | 2 days | 2 days | 04/22/10 | 04/23/10 | 29 |
| Business Process Improvement | 5 days | 5 days | 05/17/10 | 05/21/10 | 2,7,16,28 |
| Business Process Improvement Planning | 5 days | 5 days | 05/17/10 | 05/21/10 | |
| Project Planning | 5 days | 5 days | 05/17/10 | 05/21/10 | 2,7,16,28 |
| Conduct Project Planning | 5 days | 5 days | 05/17/10 | 05/21/10 | |
| Implementation Statement of Work Development | 10 days | 15 days | 05/24/10 | 06/07/10 | 31 |
| Develop Implementation Statement of Work | 10 days | 15 days | 05/24/10 | 06/07/10 | |

## Statement of Work #1



## Statement of Work #1

### 10.   Acceptance Criteria

The acceptance criteria for this Statement of Work will have been deemed met when the parties both accept, and sign the resulting Statement of Work that will be used to govern Customer's Model Office Implementation.

### 11.   Work Estimates and Customer Cooperation

The estimates for project cost provided in this Statement of Work are not fixed-price quotations for the project. The estimates provided here may be updated during the conduct of this engagement as new information becomes available, requirements change, and/or the scope is modified. Prior to exceeding the estimates provided herein or any subsequent written estimate provided under this Statement of Work, HealthEdge will obtain Customer's approval for any new estimated project cost. The estimates of time and expenses for Services may increase based upon Customer's staff availability during the performance of the Services. Customer agrees that its active and timely assistance in the performance of the Services including the supplying of qualified personnel, required information or access to its premises and or systems is of critical importance to this Statement of Work and the estimates provided herein.

### 12.   Term and Termination

Unless earlier terminated, this Statement of Work will have an initial term of three (3) months. Thereafter, it may be renewed or extended by the mutual agreement of the parties. Customer acknowledges that any termination will not relieve it of its obligation to pay for Services and expenses rendered through the date of termination.

Statement of Work #1

## 13. Approvals

POMCO, Inc.

Name: _Robert W. Pamfrey_

Signature: _[signature]_

Title: _Presidet + CEO_

Date: _4/1/2010_

**HealthEdge**

Name: _Bradley K. Desmarais S_

Signature: _[signature]_

Title: _CFO_

Date: _April 1, 2010_



CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP

**14-0310**

*Celebrating our 25th Anniversary*

Michael J. Rossi
617-348-8215
mrossi@connkavanaugh.com

January 23, 2014

**Via Hand Delivery**
Clerk's Office
Middlesex Superior Court
200 TradeCenter
1st Floor
Woburn, MA 01852

      Re:    Healthedge Software, Inc. v. POMCO, Inc.

Dear Sir or Madam:

      Enclosed for filing in the above-referenced matter, please find:

- Complaint;

- Civil Action Cover Sheet; and

- Check in the amount of $275.00.

      Thank you for your attention to the above.

                Very truly yours,

                Michael J. Rossi

MJR/dem: 3608-00

Enclosure

cc:    Thomas E. Peisch, Esq. (w/o enc.)

906509.1

Commonwealth of Massachusetts
County of Middlesex
The Superior Court

CIVIL DOCKET # MICV2014-00310-D
Courtroom Civil D- Ct Rm 620 - 200 TradeCenter, Woburn

RE:   Healthedge Software Inc. v Pomco Inc.
TO:

Thomas E Peisch, Esquire
Conn Kavanaugh Rosenthal Peisch & Ford
10 Post Office Square
Suite 400
Boston, MA 02109

## SCHEDULING ORDER FOR F TRACK

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated, and case shall be resolved and judgment shall issue **11/14/2015**.

| STAGES OF LITIGATION | DEADLINES | | |
|---|---|---|---|
| | **SERVED BY** | **FILED BY** | **HEARD BY** |
| Service of process made and return filed with the Court | 04/23/2014 | 04/23/2014 | |
| Response to the complaint filed (also see MRCP 12) | | 05/23/2014 | |
| All motions under MRCP 12, 19, and 20 | 05/23/2014 | 06/22/2014 | 07/22/2014 |
| All motions under MRCP 15 | 05/23/2014 | 06/22/2014 | 07/22/2014 |
| All discovery requests and depositions served and non-expert depositions completed | 11/19/2014 | | |
| All motions under MRCP 56 | 12/19/2014 | 01/18/2015 | |
| Final pre-trial conference held and/or firm trial date set | | | 05/18/2015 |
| Case shall be resolved and judgment shall issue by **11/14/2015** | | | **11/14/2015** |

o   **The final pre-trial deadline is not the scheduled date of the conference.**
o   **You will be notified of that date at a later time.**
o   **Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

Dated: 01/24/2014

Michael A. Sullivan
Clerk of the Court

Telephone: 781-939-2760

Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617)

| CIVIL ACTION COVER SHEET | TRIAL COURT OF MASSACHUSETTS<br>SUPERIOR COURT DEPARTMENT | DOCKET NO. **14-0310 D** |
|---|---|---|
| | **COUNTY**<br>OF<br>**MIDDLESEX** | |

| **PLAINTIFF(S)** HealthEdge Software, Inc. | **DEFENDANT(S)** POMCO, INC. |
|---|---|

| Type Plaintiff's Attorney name, Address, City/State/Zip<br>Phone Number and BBO# | Type Defendant's Attorney Name, Address, City/State/Zip<br>Phone Number (If Known) |
|---|---|
| Thomas E. Peisch BBO # 393260<br>CONN KAVANAUGH ROSENTHAL PEISCH & FORD, LLP<br>Ten Post Office Square<br>Boston, MA 02109 | |

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

CODE NO.        TYPE OF ACTION (specify)        TRACK                    IS THIS A JURY CASE?

**A01 Services Labor and Materials - Fast Track**        ⊙ ] Yes  ⊂ ] No

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS** FILED
(Attach additional sheets as necessary)
A.   Documented medical expenses to date:
  1.   Total hospital expenses                    $_____
  2.   Total doctor expenses                      $_____
  3.   Total chiropractic expenses                $_____
  4.   Total physical therapy expenses            $_____
  5.   Total other expenses (describe)            $_____
                                          Subtotal $_____
B.   Documented lost wages and compensation to date   $_____
C.   Documented property damages to date               $_____
D.   Reasonably anticipated future medical expenses     $_____
E.   Reasonably anticipated lost wages and compensation to date  $_____
F.   Other documented items of damages (describe)
                                                        $_____
G.   Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                              Total $_____

CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX
JAN 23 2014
CLERK

**CONTRACT CLAIMS**
(Attach additional sheets as necessary)
Provide a detailed description of claim(s):

| Plaintiff seeks damages for breach of contract, conversion, and unjust enrichment arising from defendant's breach of the parties' Software License Agreement and Professional Services Agreement. | ⊡ | **TOTAL** | $1MM |
|---|---|---|---|

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____        Date:    January 23, 2014
A.O.S.C. 3-2007

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

HEALTH EDGE SOFTWARE, INC.,

Plaintiff,

V.

Civil Action No.
MICV2014-00310-D

POMCO, INC.,

Defendant.

## **NOTICE OF APPEARANCE**

Kindly enter the appearances of Christopher M. Jantzen, Esquire, Christina A. Madek,
Esquire and Amanda R. Higgins, Esquire of JANTZEN & ASSOCIATES, P.C. as attorney for
the defendant, Pomco, Inc., in the above matter.

Respectfully Submitted,
POMCO, INC.,
By its Attorneys,

Christopher M. Jantzen, Esq. BBO# 545489
Christina A. Madek, Esq. BBO# 666495
Amanda R. Higgins Esq. BBO# 678434
JANTZEN & ASSOCIATES, P.C.
4 Liberty Square- Seventh Floor
Boston, MA 02109
Phone: 617-457-1919
Fax: 617-574-5050

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document
was served upon the attorney of record for each other
party by mail-hand on

APR 28 2014

CLERK

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Civil Docket**

## MICV2014-00310
### Healthedge Software Inc. v Pomco Inc.

| | | | | |
|---|---|---|---|---|
| **File Date** | 01/23/2014 | **Status** | Disposed: transfered to other court (dtrans) | |
| **Status Date** | 05/09/2014 | **Session** | D - Civil D CtRm 620 (Woburn) | |
| **Origin** | 1 - Complaint | **Case Type** | A01 - Services, labor, materials | |
| **Track** | F - Fast track | **Lead Case** | | **Jury Trial**   Yes |

### DEADLINES

| | Service | Answer | Rule12/19/20 | Rule 15 | Discovery | Rule 56 | Final PTC | Judgment |
|---|---|---|---|---|---|---|---|---|
| **Served By** | | | 05/23/2014 | 05/23/2014 | 11/19/2014 | 12/19/2014 | | |
| **Filed By** | 04/23/2014 | 05/23/2014 | 06/22/2014 | 06/22/2014 | | 01/18/2015 | | 11/14/2015 |
| **Heard By** | | | 07/22/2014 | 07/22/2014 | | | 05/18/2015 | |

### PARTIES

**Plaintiff**
Healthedge Software Inc.
30 Corporate Drive
Burlington, MA 01803
Active 01/23/2014

**Private Counsel 393260**
Thomas E Peisch
Conn Kavanaugh Rosenthal Peisch & Ford
10 Post Office Square
Suite 400
Boston, MA 02109
Phone: 617-482-8200
Fax: 617-482-6444
Active 01/23/2014 Notify

**Defendant**
Pomco Inc.
2425 James Street
Syracuse, NY 13206
Service pending 01/23/2014

**Private Counsel 545489**
Christopher M Jantzen
Jantzen & Associates PC
4 Liberty Square
7th Floor
Boston, MA 02109
Phone: 617-457-1919
Fax: 617-574-5050
Active 04/30/2014 Notify

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 01/23/2014 | 1.0 | Complaint & civil action cover sheet filed |
| 01/23/2014 | | Origin 1, Type A01, Track F. |
| 04/28/2014 | | Atty Christopher M Jantzen's notice of appearance for Pomco Inc. |
| 05/08/2014 | | Court received Notice Of Filing Of Notice Of Removal (withourt electronic docket # or seal) |
| 05/09/2014 | 2.0 | Case REMOVED this date to US District Court of Massachusetts by deft Pomco, Inc., |
| 05/09/2014 | | Findings: Above action this day removed to U.S. District Court. |